# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | Criminal No. 2:13-cr-00068 |
| v. | ) | |
| | ) | Judge Mark R. Hornak |
| MARCUS DAVIS | ) | |

## MEMORANDUM OPINION

**Mark R. Hornak, United States District Judge**

Mr. Davis is charged with one count of possession of a firearm by a convicted felon under 18 U.S.C. §§ 922(g)(1), 924(e). Pending before the Court is Mr. Davis's Motion to Suppress Evidence and Statements, which seeks to exclude from evidence statements he allegedly made and a firearm seized when law enforcement officers conducted a search of his residence pursuant to a search warrant on June 15, 2012. The Court held a suppression hearing on the Motion on November 12, 2013, after which it invited supplemental briefing from the parties.

The Court has considered the Defendant's Motion, ECF No. 25, and attached documents, ECF Nos. 25-1 – 25-5, the hearing transcript and exhibits, the United States' Response in Opposition, ECF No. 27, the Defendant's Reply, ECF No. 32, the Defendant's Supplemental Post-Hearing Memorandum, ECF No. 43, the United States' Supplemental Brief Regarding Suppression Issues, ECF No. 44, and the Defendant's Reply to the Government's Post-Hearing Brief, ECF No. 46. For the reasons that follow, the Court will grant in part and deny in part the Motion to Suppress.

I.  **BACKGROUND**

On June 15, 2012, Greensburg City Police Detective Jerry Vernail ("Det. Vernail") obtained a search warrant from a state judge for the residence located at 31 Westminster Ave., Greensburg, PA, authorizing a search for drugs, drug-related items[1], and weapons. ECF No. 25-1. The affidavit of probable cause made by Det. Vernail stated that during May and June 2012, Det. Vernail had received information that Mr. Davis was selling crack cocaine from his residence at 31 Westminster Ave. *Id.* Det. Vernail also stated that he received a tip from a "concerned citizen" that Mr. Davis might be in possession of a firearm, which as a convicted felon Mr. Davis was prohibited by law from having. *Id.* Det. Vernail and a colleague, Detective Tony Marcocci ("Det. Marcocci"), then learned from a confidential informant that they could purchase cocaine from Mr. Davis. *Id.* The affidavit further related that several days prior to the application for the warrant, law enforcement conducted a controlled purchase of cocaine by the informant from Mr. Davis. *Id.* Officers searched the informant prior to the purchase and found no contraband or money on his person. *Id.* They then observed Mr. Davis leaving 31 Westminster Ave., meeting with the informant, and returning directly to 31 Westminster Ave. *Id.* The officers searched the informant again and found a substance that tested positive as cocaine.[2] *Id.*

Based on that affidavit, a Westmoreland County Court of Common Pleas Judge found probable cause to issue a search warrant for the residence at 31 Westminster Ave. for drugs, drug-related items, and weapons. *Id.* Det. Vernail and six (6) other law enforcement officers

---

[1] The warrant includes an extensive list of items to be searched for and seized related to drug trafficking. ECF No. 25-1 at 1. For simplicity's sake, the Court will refer to those as "drug-related items," "drug paraphernalia," or "evidence of drug trafficking."

[2] The parties have debated the meaning of the exact language in the affidavit, which reads: "The informant was searched prior to and following the transaction and no contraband or monies were located on their person." ECF No. 25-1 at 3. The Court concludes that at least one reasonable, common-sense, non-technical reading of this sentence in the context of the affidavit is that the officers searched the informant prior to the controlled purchase, found no contraband, and then searched him after the purchase and found cocaine.

2

including Det. Marcocci executed the warrant that same day. ECF No. 25-3 at 6. The officers knocked at the back door of the residence, and a woman answered the door and allowed them to enter. ECF No. 25-4 at 1. As they entered, they encountered Mr. Davis standing in his underwear at the top of a stairway.[3] *Id*; ECF No. 38 at 80. Det. Marcocci asked Mr. Davis to come down the steps, and he complied. *Id.* The officers then had Mr. Davis lie face down on the floor and handcuffed him. *Id.* The officers advised Mr. Davis that he was not under arrest. *Id.* They ordered Mr. Davis to remain seated in the living room, still in handcuffs and underwear, while they proceeded to search the residence. *Id.* During the search, the officers found a .45 caliber Smith & Wesson revolver "from under the mattress where [Mr. Davis] slept." ECF No. 25-3 at 6. They then arrested Mr. Davis on the charge of possession of a firearm by a prohibited person. ECF No. 25-5 at 2.

On November 21, 2012, over five months after the execution of the search warrant, Det. Vernail filed a supplemental narrative to the incident report he prepared on the day of the arrest, which read in relevant part:

> On Tuesday November 20, 2012 I had a conversation with [Assistant District Attorney] James Lazar during which he suggested I expound on the supplement of June 15, 2012…Davis was advised the weapon was located and advised that a Comcast Cable technician found the weapon in the rafters in the basement while performing cable work. The technician gave the weapon to Davis who said he didn't know what to do with the gun and then placed it under his mattress.

ECF No. 25-3 at 6. This was the first mention of such a statement by Mr. Davis – neither Det. Vernail nor Det. Marcocci referenced Mr. Davis making any statement in the reports they filed the day the search was executed. *See* ECF Nos. 25-3 and 25-4. Det. Vernail also did not include the statement in his affidavit of probable cause in support of the criminal complaint he filed in state court or in his testimony at the state preliminary hearing. ECF Nos. 25-5, 25-2.

---

[3] He was holding a pair of sweatpants, which he was apparently not permitted to put on. ECF No. 38 at 80.

3

On November 12, 2013, Det. Vernail testified before this Court at the suppression hearing on the Defendant's Motion.[4] He admitted that his November 12, 2012 supplemental report was the first time he had made any mention of Mr. Davis's alleged statement, claiming that he did not include the statement in his initial report because he did not think it was relevant. ECF No. 38 at 64-65. Det. Vernail also testified for the first time in this Court that Mr. Davis had asked him why he was being arrested, to which Det. Vernail said that he responded that the officers had found a gun. *Id.* at 63-64. Det. Vernail acknowledged at the suppression hearing that he had not made any reference to that question from Mr. Davis in his supplemental report or in any prior report or testimony. *Id.* at 77. In response to a question from the Court, Det. Vernail stated that Mr. Davis was not free to leave during the search, and it was his intention all along to place Mr. Davis under arrest on state drug charges, although he had no arrest warrant for Mr. Davis on such charges,[5] had affirmatively told Mr. Davis that he was not under arrest, and had not told Mr. Davis of his intent to arrest him. *Id.* at 83-84, 86. Det. Vernail further acknowledged that he did not provide Mr. Davis with *Miranda* warnings when he placed him under arrest or before engaging in any sort of conversation with him.[6] *Id.* at 86. The Court invited the parties to file supplemental briefs as a follow up to the suppression hearing. They accepted that invitation.

Mr. Davis argues that his alleged statement should be suppressed for two reasons: first, because there is insufficient evidence that he made the statement in question (or any statement about the gun), and second, if the Court finds that there is sufficient evidence of the statement, it

---

[4] On March 12, 2013, a federal grand jury returned a one-count indictment against Mr. Davis for possession of a firearm by a convicted felon, and the federal Government then adopted this case as its own. ECF Nos. 3-4.

[5] Something he presumably could have done when he obtained the search warrant from the state court judge.

[6] Det. Vernail testified that he does not always include such details about an arrest in the incident reports he prepares about arrests. (ECF No. 38 at 88).

4

should be suppressed because the officers did not give him *Miranda* warnings prior to his making it. The Government retorts that Det. Vernail's testimony about the statement was credible, and the statement should not be suppressed because Mr. Davis was not in custody or subject to interrogation at the time he made it.

Mr. Davis also contends that the firearm found during the search should be excluded from evidence because the search warrant was not supported by probable cause. According to the Government, this Court should in essence defer to the state judge's finding of probable cause or conclude that even if the state judge erred in finding probable cause for the search warrant, the firearm should not be suppressed because the officers acted in good faith reliance on the warrant under the rule articulated in *United States v. Leon*, 468 U.S. 897 (1984).

## II. **DISCUSSION**

### A. **Suppression of the Alleged Statement**

*Miranda* warnings are required when an individual is subject to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 477-78 (1966). In other words, a defendant's *Miranda* rights attach to a statement if it was made when the defendant was "in custody," and the statement was the product of "interrogation." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). From the Court's perspective, Mr. Davis has satisfied his burden of production for the Motion to Suppress by alleging that he was in custody when the challenged statement was made without being given *Miranda* warnings. *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986). In addition, as set out below, at least one version of Det. Vernail's recounting of his oral exchange with Mr. Davis meets the definition of "interrogation." *See United States v. McArthur*, 2012 WL 6194396, at *3 (D. Minn. Dec. 12, 2012). Therefore the Government was required to prove by a preponderance of the evidence that Mr. Davis's statements were not the product of custodial interrogation. *See*

*United States v. DeSumma*, 44 F.Supp.2d 700, 703 (E.D. Pa. 1999); *United States v. Prince*, 157 F.Supp.2d 316, 324 (D. Del. 2001).

At a suppression hearing, as the finder of fact, the Court determines the credibility of witnesses and may accept or reject any or all of a witness's testimony. *United States v. Howard*, 787 F.Supp.2d 330, 331-32 (D.N.J. 2011). The Court judges credibility by considering a number of factors, including the witness's demeanor and manner on the stand, his ability to accurately recollect the matters at hand, the manner in which he may be affected by the outcome, the extent to which his testimony is either supported or contradicted by other evidence and testimony in the case, and whether it withstands the "common sense test." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005). A witness should not be found more or less credible because he is a law enforcement officer. *Id.*

Based on the Court's assessment of the record as a whole, its own observations of Det. Vernail's in-court testimony (including his testimony that Mr. Davis made an incriminating statement about the firearm), and his latest version of the context in which the statement was made, the Government has failed to carry its burden. Neither Det. Vernail nor Det. Marcocci included any such statement from Mr. Davis in their incident reports, which were prepared the day of the search. Det. Vernail did not mention the challenged statement in his affidavit supporting the state criminal complaint against Mr. Davis, or at the state preliminary hearing on the gun charge stemming from the search. He first referenced any statement by Mr. Davis in a supplemental report filed over five months later, after he had a conversation with the Assistant District Attorney on the case. In that supplemental report, he never mentions Mr. Davis's now-alleged opening question "why am I under arrest," but instead reports the events as though Mr. Davis was simply confronted with the gun by Det. Vernail and then responded with the story

about the Comcast technician finding the gun.[7] Then, months after that, at the suppression hearing in this Court, Det. Vernail testified for apparently the first time that Mr. Davis had asked him why he was being arrested, Det. Vernail told Mr. Davis (the gun), and that Mr. Davis then made an uninvited statement relative to it being found by the Comcast technician.[8]

Det. Vernail's claim that he did not consider the alleged statement to be "relevant" – although such a statement would clearly have confirmed that Mr. Davis was knowingly in possession of the firearm, the whole basis of the charged offense – is highly implausible. As shown in the affidavit of probable cause he filed in support of the search warrant, Det. Vernail is an experienced police detective who has assisted in the execution of approximately 100 search warrants. ECF No. 25-1 at 2. Presumably, as such he would have included such discourse with the Defendant, including a directly incriminating statement about possession of the gun, in his incident report, or then in his criminal complaint affidavit, or then in his testimony at a preliminary hearing for possession of a firearm by a prohibited person. Det. Vernail's testimony in this Court, and his varied reports about the events at the search considered as a whole, simply fail the "common sense test."

The credibility of Det. Vernail's testimony in this Court is also undermined in at least two other ways -- first, by his testimony that Mr. Davis was not free to leave when the search began

---

[7] It appears undisputed that the residence did not have cable service, Comcast or otherwise, but instead received its television signal via a satellite dish. (ECF No. 38 at 78-79).

[8] The Court concludes that the import of Det. Vernail's statement in the supplemental report is fairly considered to be "interrogation" for *Miranda* purposes. In that version of events, Det. Vernail confronts Mr. Davis with the gun, without comment nor in response to anything said by Mr. Davis. In that supplemental report it states "Davis was advised that the weapon was located and advised that a Comcast cable technician found the weapon . . ." ECF No. 25-3 at 6. The common sense reading of this is that Mr. Davis was told ("advised") about the gun, and responded ("advised") with the Comcast explanation. In this scenario, in the overall context of the events unfolding at the scene of the search, Det. Vernail "should have known" that his confronting Mr. Davis about the gun was "reasonably likely" to elicit an incriminating response. *See Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980). The Government bears the burden of proof to establish by a preponderance of the evidence that a challenged statement is voluntary and therefore not the product of interrogation. *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)). The Court concludes that it has not done so, and that at least this version amounted to interrogation for *Miranda* purposes.

7

because "prior to the gun being located, he would have been arrested anyway." ECF No. 38 at 83. That testimony, indicating that Det. Vernail intended to arrest Mr. Davis regardless of the results of the search and reflecting the reality that Mr. Davis was not free to leave (or even get up from the couch) while the search was going on, was contrary to the position the Government took at the outset of the suppression hearing – that Mr. Davis was not under arrest during the search but was merely detained for safety purposes.[9] *See United States v. Lawson*, 961 F.Supp.2d 496, 504-05 (W.D.N.Y. 2013) (Finding testimony of law enforcement officers not credible in part because their testimony contradicted the position the Government took prior to the suppression hearing). Presumably because any such position was also at odds with the facts of Mr. Davis' situation during the search, and with Det. Vernail's testimony that it was his plan all along to arrest Mr. Davis, the Government abandoned any argument that Mr. Davis was not in custody for *Miranda* purposes mid-hearing, ECF No. 38 at 93-94, and conceded that "it was understood" Mr. Davis was under arrest when the statement was made.[10]

---

[9] Several points in this regard. Dr. Vernail testified in response to the Court's question as to whether Mr. Davis was under arrest stating, "I don't know that he wasn't under arrest. He was not free to leave. He was not detained." (ECF No. 38 at 84). The last two sentences are wholly at odds with one another, and the first strikes the Court as saying that Mr. Davis was under arrest, but that he just did not know it. Second, in noting the variance between Det. Vernail's testimony in this Court and the Government's position in its pre-hearing brief, (ECF No. 27 at 10-11) the Court does not question the candor of counsel for the United States. From the Court's observation, the explanation that Det. Vernail went to the house with the intention of making a warrantless drug arrest of Mr. Davis notwithstanding the officers' statements to him about not being under arrest, and his testimony that Mr. Davis asked why he was under arrest, seemed to pretty much come out of the blue at the suppression hearing.

[10] Although the Court need not reach the *Miranda* custody inquiry in this Opinion due to that concession, to argue that Mr. Davis was not at least in custody for *Miranda* purposes would also fail the "common sense test." Courts determine whether a person is in custody under *Miranda* through an examination of the totality of the objective circumstances. *Berkemer v. McCarty*, 468 U.S. 420, 442, n.35 (1984); *California v. Beheler*, 463 U.S. 1121, 1125 (1983). A court must first determine whether under the circumstances, a reasonable person would have felt that he was not at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The ultimate question is then whether there was "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id.* Mr. Davis was forced to lie face down inside his home in his underwear while he was handcuffed. He was then seated, half-clothed, on his couch while seven (7) police officers searched his home for approximately an hour. It is readily apparent that under an objective standard, any reasonable person in Mr. Davis's restricted circumstances would not have experienced any feelings of liberty and, once handcuffed and surrounded by law enforcement officers, would have objectively and reasonably concluded that he was at least "in custody" if not under arrest. *See New York v. Quarles*, 467 U.S. 649, 655 (1984) (Suspect who was surrounded by at least four police officers and handcuffed when questioned was in police custody at the time of questioning for

8

The Court also finds it most noteworthy that while the written inventory of the property seized in the search (ECF No. 25-1 at 6) included, among other things, one (1) Lipton Brisk Iced Tea container and one (1) Dasani Water bottle,[11] it did not include the gun which is at the center of the case. Det. Vernail testified in this Court that he found the gun, and that he completed that inventory form after the Defendant and the gun were taken to the police station, and that the gun was "overlooked." ECF No. 38 at 83. The record does not include any explanation for how or why, in a gun case, the gun itself was "overlooked" in the inventory form prepared by the officer who found the gun and arrested the Defendant for possessing the gun.

The Court also observed the testimony of Det. Vernail in open court and is not able to discern which (if any) current or prior version of his conversation with Mr. Davis is complete and accurate, given the facial inconsistencies among them and the now-claimed incompleteness of the versions reported at points closest in time to the events in question. When they are considered one after the other, the various versions of the events build from no statement at all, to one in which Mr. Davis blurts out an explanation when simply confronted with the gun, to one in which he makes an incriminating statement only in explanation to Det. Vernail's response to a question that Mr. Davis first posed. Of course, this is a continuum from no statement at all, to one that is the functional equivalent of interrogation under *Innis*, to one that may be admissible as a voluntary statement in a back-and-forth conversation that the Defendant started. *United States v. Benton*, 996 F.2d 642, 643 (3d Cir. 1993). When this is coupled with what the Court finds to be the overall tenor of the testimony of Det. Vernail on critical issues – conditional in

---

*Miranda* purposes, even though he was not yet arrested). The Court is hard-pressed to think of a set of circumstances in which a citizen is forcibly handcuffed, partially-clothed, and compelled to remain seated precisely where one or more of seven (7) police officers tell them to sit, in their own home, not free to leave, for more than an hour, yet is not under arrest or "in custody." *See, cf. United States v. Prince*, 157 F.Supp.2d 316, 324 (D. Del. 2001) (short roadside detention in a police car).

[11] In the post-arrest police reports, it is averred that these were "traps" used in drug-related activities.

9

nature and filled with a number of "possibles" and "could have beens" as to important matters – the Court cannot conclude which (if any) version of these events actually happened.

For these reasons, the Court finds and concludes that Det. Vernail's testimonial stream is consistently inconsistent, and the description of the statement and the circumstances of it as described at the suppression hearing is incompatible with a "common sense" evaluation of the whole record. *Lawson*, 961 F.Supp.2d at 504. The Court further finds and concludes that the Government has failed to meet its burden of proving by a preponderance of the evidence that Mr. Davis made the challenged statement(s) about the gun and that it was not the product of custodial interrogation.[12] *See McArthur*, 2012 WL 6194396 at *3-4 (Suppressing two statements allegedly made by the defendant because the Government had not met its burden of showing that they were not taken in violation of *Miranda* where the only witness to testify regarding the alleged statements, one of the law enforcement officers executing the search, had an unclear memory of the events encompassing the search and seemed to offer inconsistent statements about those events). Accordingly, the Court will grant the Defendant's Motion to Suppress the asserted statement(s) by Mr. Davis about the gun.

### B. Suppression of the Firearm

In evaluating the propriety of a search warrant, a district court must exercise a deferential review of the initial probable cause determination of the issuing judge. *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993), *cert. denied*, 510 U.S. 1177 (1994) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). The issuing judge's duty is to make a "practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him...there is a fair

---

[12] In this regard, the Court does not need to address Det. Vernail's testimony that "it was possible" that Mr. Davis told the police officers that as he was being handcuffed, he (Mr. Davis) "needed to call his lawyer," and was told by the Greensburg Police that this was not necessary because he (Mr. Davis) was not under arrest, even though he plainly was at least "in custody," and the police had come to his home with the intention of effecting his warrantless arrest. (ECF No. 38 at 81).

probability that contraband or evidence of a crime [would] be found in a particular place." *Gates*, 462 U.S. at 238. A reviewing court must determine whether the magistrate had a "substantial basis" for determining that probable cause existed. *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (citing *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993)). Therefore, this Court must "uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found." *Conley*, 4 F.3d at 1205; *see United States v. Golson*, 743 F.3d 44, 53 (3d Cir. 2014).

The Court concludes that the affidavit in support of the search warrant contained sufficient information to establish a substantial basis for a fair probability that drugs or drug paraphernalia would be found inside the residence at 31 Westminster Ave. According to the affidavit, Det. Vernail received information over several weeks that Mr. Davis was selling drugs from his home at 31 Westminster Ave. Det. Vernail then received further information from a reliable confidential informant that he could purchase cocaine from Mr. Davis. Det. Vernail corroborated this information by having the confidential informant make a controlled purchase from Mr. Davis, during which officers viewed Mr. Davis leaving the residence, meeting the informant, and returning directly to the house. The officers searched the informant before and after the transaction and found him to be in possession of cocaine following the purchase.

This information was enough for the state judge to find probable cause to issue a warrant to search the home from which Mr. Davis came and went for drugs and drug paraphernalia. *See United States v. Gayle*, 2006 WL 2371971, at *2 (E.D. Pa. 2006) (Warrant provided a substantial basis for determining that a fair probability existed that evidence of drug trafficking would be found at or inside the residence to be searched where the affidavit averred that police received information about the distribution of crack cocaine from the residence, corroborated the information with controlled purchases of crack cocaine from the residence by a confidential

11

informant who was searched prior to the transactions, and observed the defendant coming from inside the residence to meet with the informant).

However, the affidavit did not establish a substantial basis to support a fair probability that weapons would be found inside 31 Westminster Ave. The affidavit merely stated that Det. Vernail received information from "a concerned citizen" that Mr. Davis "may be in possession of a firearm." ECF No. 25-1 at 3. The Supreme Court has held that an anonymous, uncorroborated tip alone cannot establish probable cause; a magistrate's action "cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239. The warrant was therefore overbroad as to its authorization to search the residence for weapons. *See United States v. $92,422.57*, 307 F.3d 137, 149 (3d Cir. 2002) ("An overly broad warrant...authorizes the seizure of items as to which there is no probable cause.")[13]

Under the good faith exception to the exclusionary rule, suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority," even though no probable cause to search exists. *Zimmerman*, 277 F.3d at 436 (quoting *United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1999)). "'A warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" *Leon*, 468 U.S. at 922 (quoting *United States v. Ross*, 456 U.S. 798, 823, n.32 (1982)). The Third Circuit has identified four situations where an officer's reliance on a warrant does not implicate this good faith exception:

- Where the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit;
- Where the magistrate abandoned his judicial role and failed to perform his neutral and detached function;
- Where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

---

[13] A court may remedy an overbroad warrant by striking the portions unsupported by probable cause and preserving the aspects of the warrant that do satisfy the Fourth Amendment, since "[e]vidence seized pursuant to an overly broad warrant need not be suppressed if the good faith exception applies." *Id.*

- Where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Zimmerman*, 277 F.3d at 436-37 (internal citations omitted).

None of those four situations are implicated by the facts of this case. The Defendant only contends that one applies -- he argues that the warrant was so lacking in indicia of probable cause as to render any belief in its existence entirely unreasonable. However, as this Court has already concluded, the affidavit does provide sufficient facts to establish a basis for probable cause to search the residence for drugs and drug-related items. Because the officers searched the residence pursuant to a warrant valid to the extent that it authorized them to search for drugs and other evidence of drug trafficking, and the space under Mr. Davis's mattress was a reasonable location for them to search for such items, they had a valid Fourth Amendment justification to search there. *See Horton v. California*, 496 U.S. 128, 138-42 (1990) (If a police officer has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, such suspicion does not immunize the second item from seizure if it is found during a lawful search for the first).

Further, even if the warrant was not sufficiently supported in this regard, the Court cannot conclude that it was so facially lacking in probable cause that any responsible executing police officer would have realized that it, and any search pursuant to it, was invalid. In addition, here the executing officer was also the affiant/applicant for the warrant. To decline to apply the *Leon* rule here would, in essence, have required Det. Vernail to "overrule" the judge of a state court of record who had moments before issued the warrant, telling the judge that the warrant just issued on his affidavit was facially and blatantly invalid.[14] There is simply no record basis that would

---

[14] Mr. Davis has conceded that whether Det. Vernail subjectively intended to arrest him prior to executing the search warrant is irrelevant to the validity of the search, as the good faith standard is an objective one that determines whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. *See Leon*, 468 U.S. at 922 n.23.

13

have supported or mandated a reasonable police officer calling into question the legal validity of this warrant in the context of all of the circumstances present here.

The Court concludes that the search warrant was supported by the necessary basis for the state court judge to find probable cause to search Mr. Davis's residence for drugs and drug paraphernalia, and it was overly broad in including weapons within its ambit. The Court will therefore strike that portion of the warrant. Because the remainder of the warrant was valid, and/or it has not been demonstrated that the officers nonetheless acted in bad faith in relying on it in conducting their search, the Court will not suppress the gun which was the fruit of that search.

### III. <u>CONCLUSION</u>

The Court will grant the Defendant's Motion to Suppress to the extent that it will exclude from evidence Mr. Davis's alleged incriminating statements about the gun and deny the Motion to the extent that it will not exclude from evidence the firearm located as a result of the search of Mr. Davis's residence. An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: April 9th, 2014
cc: All Counsel of Record